IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 19-112-BLG-DLC-TJC |
| Plaintiff, | |
| vs. | **FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| JAMES WAYNE WATSON, | |
| Defendant. | |

Defendant James Wayne Watson ("Watson") is charged with being a prohibited person in possession of a firearm.  (Doc. 1.)  He has filed a Motion to Suppress Evidence under the Fourth Amendment.  (Doc. 53.)  U.S. District Judge Dana L. Christensen referred the motion to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 59(a), Fed. R. Crim. P., to conduct a hearing and issue appropriate findings and recommendations.  (Doc. 74.)

Watson asserts that all evidence obtained from the search of his vehicle and cell phone after he was arrested on July 29, 2019 should be suppressed.  Watson contends (1) he was unreasonably seized; (2) the warrantless search of his vehicle was not a valid search incident to arrest; and (3) all evidence from the search of his cell phone pursuant to a state search warrant should be suppressed as "fruit of the poisonous tree."

1

The Court held an evidentiary hearing on March 6, 2020, and the parties presented evidence on the motion.  Having considered the parties' arguments and submissions, the Court **RECOMMENDS** that Watson's Motion to Suppress (Doc. 53) be **GRANTED in part** and **DENIED in part**.

## I.       BACKGROUND

The Court heard testimony from ATF Task Force Officer Steven Feuerstein, Billings Police Officer Brian Abel, Billings Police Detective Brett Lapham, and Billings Police Officer Mitch Hillier.  The following facts are taken from the hearing testimony and the exhibits submitted to the Court.

On July 24, 2019, Watson texted three photos of himself to his ex-girlfriend ("Jane Doe").  The photos show Watson holding a silver handgun to his head in different poses.

The next day, on July 25, 2019, Billings Police Officer Mansur responded to the Western Security Bank regarding a report that Watson had been harassing Jane Doe on a regular basis while she was working at the bank.  Jane Doe had alerted her supervisors about the three text messages showing Watson with the gun to his head.  Jane Doe reported to Officer Mansur that Watson likely carried the gun in his backpack, that he had a history of methamphetamine use, mental health issues, and was a convicted felon and registered violent offender.  Western Security Bank requested that a no trespass warning be issued for Watson.

2

That same day, Jane Doe also personally obtained a Temporary Order of Protection ("TRO") against Watson.  (Doc. 55-3.)  Among other things, the TRO prohibited Watson from threatening Jane Doe or communicating with her directly or indirectly.  It also required that Watson stay at least 300 feet from Jane Doe and from several specific locations in the Billings area.  It did not, however, contain a prohibition on Watson's possession of a firearm.  The TRO was served on Watson without incident on July 26, 2019 at 3:25 p.m.

TFO Feuerstein testified that Officer Mansur contacted him by email on July 26, 2019.  Officer Mansur asked TFO Feuerstein for assistance with his investigation of Watson.  TFO Feuerstein testified that he was familiar with Watson from a 2009 case that he had investigated involving Watson's possession of a firearm as a convicted felon.  TFO Feuerstein also knew Watson to be a methamphetamine user who was involved in mixed martial arts.

TFO Feuerstein advised Officer Mansur to put out an "officer caution" regarding Watson because he was a felon, possibly suicidal, committing harassment, and was possibly armed.  The officer caution was issued, and it was included in daily Billings Police Department briefings from July 26, 2019 through July 29, 2019.  The officer caution included the three pictures of Watson holding the firearm, and advised officers that Watson was a convicted federal felon, had recently come into possession of a large caliber revolver, reportedly carried the

3

handgun in a backpack, and drove a black Honda Civic with temporary tags. Officers were directed "[i]f located, use caution and issue a no trespass warning for Western Security Bank . . . ."

On July 28, 2019, at approximately 11:15 p.m., Jane Doe called the police because Watson had contacted her and indicated he was going to hang himself in a tree. She reported that Watson had a gun in the past and possibly had knives. Officers responded but were unable to locate Watson that night.

The following morning, on July 29, 2019, Watson was located and served with the no trespass warning for Western Security Bank without incident.

Later that day, at approximately 1:45 p.m., Officer Abel responded to Jane Doe's house to investigate the violation of the TRO. Jane Doe reported that Watson had had been sending her suicidal and threatening text messages despite the TRO. She showed Officer Abel some of the texts and emailed him copies for his report. (Doc. 54-2 at 4-5.) She also reported that Watson had made threats against her and their unborn child, although the Government acknowledges it is unclear when those alleged threats were made. (Doc. 87 at 104:21-105:13.) After speaking with Jane Doe, Officer Abel submitted a warrant request for Watson's arrest. Officer Abel testified that he requested the warrant between 3:00 and 4:00 p.m.

4

At approximately 4:20 p.m. on that date, TFO Feuerstein encountered Watson while driving home after his shift.  TFO Feuerstein testified that he was driving his unmarked government vehicle eastbound in the center lane of 4th Avenue North in Billings, when a black Honda Civic abruptly cut him off.  TFO Feuerstein noticed the vehicle had a dealer plate and a damaged front end and cracked windshield.  Finding the car suspicious, TFO Feuerstein decided to get a description of the driver and call it into dispatch.  He drove past the Honda and observed Watson driving.  TFO Feuerstein identified Watson based on his previous knowledge of him and from the daily police briefings.

TFO Feuerstein pulled in front of Watson to monitor his movements.  Although he did not have a service radio, he was able to contact Billings Police Department dispatch from his cell phone.  TFO Feuerstein, with Watson behind him, continued going eastbound on 4th Avenue North, until they were stopped by a traffic light at the intersection of Main Street and 4th Ave.  When the traffic signal changed, TFO Feuerstein turned onto Main Street, but Watson crossed over into the far-right lane and exited Main Street onto a northbound road known as the Bench Connector.  TFO Feuerstein was briefly stuck in traffic before he was able to also make his way onto the Bench Connector.  He then followed Watson, who was several blocks ahead of him by that point.  TFO Feuerstein remained in contact with dispatch via his cell phone, and advised of Watson's location.

5

Around the same time, Detective Lapham was also driving home at the end of his shift in an unmarked car.  He heard the radio traffic about Watson, and since he was in the area and was aware of Watson through the officer caution, he decided to assist.  Detective Lapham testified that during the course of the radio communications, a Commander instructed officers to arrest Watson for violation of the TRO, if possible.

Officer Hillier was also on patrol in the area at the time, and he also responded.  He testified he understood from dispatch that Watson was to be arrested for a TRO violation.

TFO Feuerstein continued to follow Watson and observed Watson turn left on the north side of a Walmart, as if he was going to turn into the Walmart parking lot.  Feuerstein turned into the Walmart parking lot to locate Watson.  At this point, TFO Feuerstein was aware through dispatch that other officers were also looking for Watson.  He was unaware, however, that Watson was to be arrested, or that he had violated a TRO.

Detective Lapham caught up to TFO Feuerstein as he was entering the Walmart parking lot.  He observed TFO Feuerstein's truck turn up one of the parking aisles, and he went up the next aisle.  Detective Lapham also saw Officer Hillier's marked BPD unit coming into the parking lot, and he radioed for Officer Hillier to follow TFO Feuerstein's truck.

6

Therefore, three law enforcement officers converged on Watson in the Walmart parking lot.  Their testimony regarding the events that followed is largely consistent, although they diverge on certain relevant details.

**TFO Feuerstein**

TFO Feuerstein testified that he found Watson's car parked along the sidewalk by the north entrance to Walmart.  TFO Feuerstein stated he stopped his vehicle near Watson's vehicle, and he approached Watson with his pistol held down at his side.  TFO Feuerstein explained he removed his pistol from his holster because he believed Watson may have been armed and a threat to himself or others.  TFO Feuerstein said he wanted to make contact with Watson to talk to him about the gun in the pictures.  As he approached, TFO Feuerstein stated Watson was outside his vehicle, but leaning down into the front driver's side of the car.  Watson's car door was open, but because Watson was leaning into the car, TFO Feuerstein could not see what Watson was doing.

According to TFO Feuerstein's testimony, Watson turned his head and looked at him as he approached.  Watson had a stick in his right hand, and when he saw TFO Feuerstein, he placed the stick against the side of the car.  TFO Feuerstein said he called out to Watson and told him to turn around.  Watson complied, which made his left hand visible.  TFO Feuerstein saw he had cell phone and some paperwork or identification in his left hand.  TFO Feuerstein testified

7

that he then identified himself and told Watson he wanted to talk to him.  He said Watson immediately started saying he had already talked to officers earlier in the day and had gotten everything straightened out.  TFO Feuerstein responded that he just wanted to talk to Watson.  TFO Feuerstein estimated his exchange with Watson lasted for only a few seconds.

At that point, TFO Feuerstein testified that Officer Hillier approached the scene from TFO Feuerstein's left side, and said "enough James, you're under arrest."  TFO Feuerstein stated he did not know what Watson was being arrested for at that time.

After being told he was under arrest, TFO Feuerstein's testified that Watson started slowly moving down the side of the Honda.  TFO Feuerstein believed Watson was going to flee because Watson looked at him and then down the aisle of the parking lot.  Therefore, as Watson moved around the back of the Honda, TFO Feuerstein grabbed Watson, picked him up, and pushed him down onto the trunk of the Honda and held him there.  Officer Hillier also had Watson by the right hand.  TFO Feuerstein told Watson to calm down, and that he would let him up if he would be calm.  Watson replied "okay."  But as soon as TFO Feuerstein eased the pressure on Watson, he started to struggle.  Watson was able to break away from the officers and ran toward the north doors of Walmart.  In the scuffle, Watson's glasses fell off and he dropped his phone and documents.

8

**Officer Hillier**

Officer Hillier testified that he arrived at Walmart a couple minutes after TFO Feuerstein.  He parked his patrol car about 10 feet from TFO Feuerstein's truck, and got out.  Officer Hillier's testified he saw Watson getting out of his vehicle, and TFO Feuerstein was giving him commands to turn around and back up to Feuerstein's position behind the car.  Watson was not complying.  Officer Hillier testified that as he walked up next to TFO Feuerstein, Watson made his way to the corner of the Honda's trunk, and TFO Feuerstein pushed him up against the trunk because he was not being compliant.  Officer Hillier did not recall telling Watson that he was under arrest.  Officer Hillier then moved in and tried to handcuff Watson.  As he attempted to do so, however, Watson broke free and fled.

**Detective Lapham**

Detective Lapham testified that as he pulled up and stopped, he saw TFO Feuerstein, Officer Hillier, and Watson standing near the back of Watson's vehicle. He stated everything looked like it was okay at that moment, so he looked away to locate a parking spot.  When he turned back, he saw a flurry of activity and Watson running from the officers.  Detective Lapham, therefore, left his vehicle and started chasing Watson on foot.  Detective Lapham estimated that less than a minute passed between the time TFO Feuerstein and Officer Hillier made contact with Watson and the physical confrontation.

9

TFO Feuerstein and Officer Hillier also gave chase.  Watson ran past the Walmart entrance, to a grassy hill on the edge of the parking lot, where he gave up on the lawn.  Detective Lapham was the first to arrive, and he drew his weapon and gave Watson commands to show his hands and stay on the ground.  Detective Lapham held Watson at gunpoint until other officers could arrive.  When TFO Feuerstein caught up, he secured Watson in handcuffs.  Watson was then placed in the back of a patrol car.

After Watson was secured in the patrol car, TFO Feuerstein decided to search Watson's vehicle.  Although he did not know the reason for Watson's arrest initially, TFO Feuerstein testified he was later informed it was for violation of the TRO.  TFO Feuerstein testified he was searching for violations of the TRO, which he understood prohibited Watson from possessing a firearm.  TFO Feuerstein testified that Officer Hillier helped him with the search, but Officer Hillier denied participating in the search.

During the search, TFO Feuerstein located a backpack, and he found a .357 stainless steel revolver inside.  The revolver appeared similar to the gun depicted in the photographs of Watson.  TFO Feuerstein also found some .357 caliber bullets in the backpack.  TFO Feuerstein also recovered Watson's cell phone and documents from the parking lot.  He secured the cell phone and applied for a search warrant in the Montana 13th Judicial District Court.  The warrant was

granted, and the subsequent search of the phone revealed photos of Watson with the revolver, and Facebook and Instant Messenger chats wherein Watson was looking for ammunition for the gun.

## II.   <u>DISCUSSION</u>

### A.   **Whether Watson was Unreasonably Seized**

Watson argues he was unreasonably seized by TFO Feuerstein the moment TFO Feuerstein approached his vehicle.  Watson further argues there was no basis for his arrest.  The Government counters that Watson was never seized by TFO Feuerstein, but was subsequently lawfully arrested for violating the TRO.

The Fourth Amendment protects persons against unreasonable searches and seizures.  U.S. Const. Amend. IV.  In general, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  The Ninth Circuit has identified five factors to aid in determining whether a reasonable person would have believed he was free to ignore the police presence and go about his business: "(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to

11

terminate the encounter." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004).

A seizure only occurs, however, "when a suspect is physically forced to stop or when the suspect submits to the officer's show of authority." *United States v. Hernandez*, 27 F.3d 1403, 1406 (9th Cir. 1994). If the suspect does not yield to the show of authority, and instead flees, no seizure occurs until the suspect is physically subdued. *California v. Hodari D.*, 499 U.S. 621, 627-29 (1991) (holding that where the defendant ran from police, he was not seized until he was tackled, and the drugs he abandoned while he was running were not the fruit of a seizure); *Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned."); *United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir. 1992) ("[I]f, in response to a show of authority, the subject does not yield . . . the seizure occurs only when the police physically subdue the subject").

Even where a suspect briefly hesitates or engages in a short verbal exchange with officers prior to flight, courts have found there is no seizure. *See e.g. United States v. McClendon*, 713 F.3d 1211, 1215-16 (9th Cir. 2013); *United States v. Smith*, 633 F.3d 889, 892-93 (9th Cir. 2011). Likewise, there is no seizure if an

12

officer unsuccessfully attempts to physically restrain a suspect, but the suspect breaks free and flees.  *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994) (finding no seizure occurred where an officer grabbed the defendant as he attempted to climb over a gate, but lost physical control over him after a brief struggle and the defendant ran away).

Here, Watson was confronted by two officers, one with his weapon displayed, in a parking lot outside Walmart.  Further, Watson was given instructions to turn around and face TFO Feuerstein, had a short conversation with TFO Feuerstein, was possibly told he was under arrest, and was momentarily restrained on the trunk of his vehicle.  At no point was Watson told he was free to leave.  If Watson had yielded to the officer's authority, these facts would likely support a finding that Watson was seized.  Critically, however, Watson never submitted to the officers' show of authority and was never under their physical control until he was apprehended on the grass.

In *Smith*, the Ninth Circuit held an individual was not seized where he engaged in a limited verbal exchange with an officer.  *Smith*, 633 F.3d at 891-93. There, the defendant had crossed the street in front of the officer's patrol car.  *Id.* at 891.  The officer activated his siren, pulled over and exited the vehicle, and called for the defendant to stop and go stand in front of the patrol car.  *Id.*  The defendant turned towards the officer and asked some questions, took a few steps towards the

13

patrol car, but then backed away and turned and ran.  *Id.*  The defendant eventually

tripped and fell, and the officer was able to catch up to him and place him in

handcuffs.  *Id.*  The Ninth Circuit held there was no seizure until the defendant was

apprehended after he fell.  *Id.* at 893.  The Court explained that because the

defendant "did not submit to the officer's show of authority, and because he was

not otherwise coerced or physically forced to submit, [the defendant] was not

seized within the meaning of the Fourth Amendment during his initial encounter

with the officer."  *Id.* at 893.  The Court further noted that it had "expressly

'decline[d] to adopt a rule whereby momentary hesitation and direct eye contact

prior to flight constitutes submission to a show of authority."  *Id.* citing *United

States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994).

Similarly, in *McClendon*, the Ninth Circuit found no seizure occurred where

a group of officers approached the defendant, asked if he was "Eddie," and the

defendant replied "Yes, that's me" and then turned and walked away.  *United

States v. McClendon*, 713 F.3d at 1213.  The officers drew their guns, told the

defendant he was under arrest and ordered him to show his hands.  *Id.*  But the

defendant continued walking away from them.  *Id.*  The officers then closed the

distance, and forcibly arrested the defendant by tackling him and placing him in

handcuffs.  *Id.* at 1214.  The Court held the defendant's initial response of

answering "Yes, that's me" was not sufficient to show he had submitted to their

14

authority. *Id.* at 1216. The Court found the defendant's act of walking away when he was ordered to stop at gunpoint also showed a failure to submit to the authority of the police. *Id.* The Court, therefore, determined the defendant was not seized until he was tackled. *Id.*

Like *Smith* and *McClendon*, Watson engaged in a short verbal exchange with TFO Feuerstein after TFO Feuerstein directed him to turn around. TFO Feuerstein told Watson he wanted to talk to him, and Watson replied he had already talked to law enforcement. This exchange was brief, as both TFO Feuerstein and Detective Lapham attested. TFO Feuerstein stated that Officer Hillier then told Watson he was under arrest. Although this testimony was contradicted by Officer Hillier, it is undisputed that Watson began moving down the side of his car and made a furtive glance toward the aisle as if he was going to run, indicating he did not intend to submit to the officers' show of authority. Therefore, the Court finds Watson was not seized during his initial encounter with TFO Feuerstein and Officer Hillier.

Watson was also never physically seized until he was subdued on the grass. Although TFO Feuerstein briefly restrained Watson on the trunk of the Honda and Officer Hillier attempted to handcuff him, Watson struggled with the officers and quickly broke free and ran. "A seizure does not occur if an officer applies physical force in an attempt to detain a suspect but such force is ineffective." *Hernandez*,

15

27 F.3d at 1407.  Thus, Watson's brief detention at the back of his car was at most an attempted seizure.  "Attempted seizures of a person are beyond the scope of the Fourth Amendment."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998).

Accordingly, Watson was not seized until he was physically restrained after the foot chase.  At that point, the officers had reasonable suspicion to seize him. As the Supreme Court has noted, "Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Watson's flight in the circumstances of this case "was sufficient to engender reasonable suspicion."  *Smith*, 633 F.3d at 894. (finding the defendant's sudden flight created a reasonable suspicion he was involved in criminal activity).

Watson's subsequent arrest was also supported by probable cause.  Mont. Code Ann. § 46-6-311(1) provides that "[a] peace officer may arrest a person when a warrant has not been issued if the officer has probable cause to believe that the person is committing an offense or that the person has committed an offense and existing circumstances require immediate arrest."  Mont. Code Ann. §46-6-311(1). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."  *Maryland v. Pringle*, 540 U.S. 366, 371

16

(2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  "Probable

cause to arrest exists when officers have knowledge or reasonably trustworthy

information sufficient to lead a person of reasonable caution to believe that an

offense has been or is being committed by the person being arrested."   *United*

*States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  Probable cause is a fluid

concept that turns on the assessment of probabilities in a particular factual context.

*Illinois v. Gates*, 462 U.S. 213, 232 (1983).  "[P]robable cause requires only a

probability or substantial chance of criminal activity, not an actual showing of such

activity."  *Id.* at 243, n.13.

Here, Detective Lapham and Officer Hillier were aware from dispatch that

earlier that day another officer had taken a report that Watson had violated a TRO.

Detective Lapham testified he was also aware from radio traffic that the officer

who took the report had filed a warrant request.  Both officers testified that a

commander got on the radio and instructed the officers to arrest Watson if possible

for violating the TRO.  On these facts, the Court finds the officers had probable

cause to arrest Watson for violation of the protective order.

### B.     Search of Vehicle Incident to Arrest

Watson next contends the search of his vehicle following his arrest was not a

valid search incident to arrest.  The Government counters that Watson's car was

properly searched.

Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment, subject to a few well-established exceptions, including the search incident to arrest exception. *Katz v. United States*, 389 U.S. 347, 357 (1967). "The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott*, 705 F.3d 410, 416–17 (9th Cir. 2012).

The Government relies on the search incident to arrest exception to the warrant requirement. In *Arizona v. Gant*, 556 U.S. 332, 343 (2009), the Supreme Court held police may search a vehicle incident to the arrest of an occupant in two circumstances: (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search"; or (2) "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" The scope of a search incident to arrest includes containers found within the passenger compartment of a vehicle. *New York v. Belton*, 453 U.S. 454, 460 (1981); *Gant*, 556 U.S. at 344.

Watson was handcuffed and secured in the back of a patrol car at the time TFO Feuerstein searched his vehicle. The search, therefore, cannot be upheld under *Gant*'s first prong. Accordingly, the issue before the Court is whether the search should be upheld under *Gant*'s second "reasonable belief" prong.

18

The Supreme Court has provided little guidance as to what the phrase "reasonable to believe" means as it is used in *Gant*, or when it would be considered reasonable for law enforcement to believe that a vehicle contains evidence of the crime for which the occupant was arrested. The Court stated that "[i]n many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. [Citations omitted]. But in others, including in *Belton* and *Thornton*,[1] the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Gant*, 556 U.S. at 343-44.

Here, Watson was arrested for violating the TRO. The question thus becomes whether TFO Feuerstein had authority to search his vehicle based solely on the fact of the arrest. Courts have generally adopted two approaches to this question. Some courts have concluded *Gant* approves a categorical rule that looks solely to the nature of the offense of arrest. Those courts reason that if the offense of arrest is one that might yield physical evidence, it is *per se* reasonable for law enforcement to believe evidence relevant to the crime might be found in the vehicle. *See e.g. Brown v. Florida*, 24 So.3d 671, 677 (Fla. Dist. Ct. App. 2009) (holding "the 'nature of the charge' is determinative of whether there exists a

---

[1] The defendants in *New York v. Belton*, 453 U.S. 454 (1981) and *Thornton v. United States*, 541 U.S. 615 (2004) were arrested for drug offenses.

19

reasonable basis to search for evidence, not whether there is some independent evidence that gives rise to a belief that the particular vehicle contains evidence."); *Idaho v. Cantrell*, 233 P.3d 178, 184 (Idaho Ct. App. 2010) (rejecting the defendant's argument that officers must possess some additional information beyond the nature of the offense to search under *Gant*; stating "[r]ather, 'the offense of arrest will supply a basis' for the search."); *United States v. Page*, 679 F.Supp.2d 648, 654 (E.D. Va. 2009) (holding that under the rationale of *Gant*, the defendant's arrest for possession of marijuana, "standing alone, justified the search of the passenger compartment of his vehicle."); *People v. Nottoli*, 199 Cal. App. 4th 531, 553 (Cal. Ct. App. 2011) (stating "nothing in *Gant* suggests that the Supreme Court was adopting a fact-intensive test similar to the reasonable suspicion standard established by *Terry v. Ohio,*" but rather "*Gant* indicated that the nature of the crime of arrest was determinative.").

   Other courts have required some degree of articulable suspicion that evidence might be found in the vehicle based on the particular circumstances surrounding the arrest.  Those courts have generally found that the 'reasonable belief' standard under *Gant* is analogous to the reasonable suspicion standard applied under *Terry v. Ohio*, 392 U.S. 1 (1968).  *See e.g. United States v. Reagan*, 713 F.Supp.2d 724, 728, n.2, 733 (E.D. Tenn. 2010) (finding "*Gant* does not create a *per se* rule that a search of a vehicle passenger compartment incident to arrest is

always permissible when the offense of arrest is of one type, and never permissible

when the offense is of another type"); *United States v. Taylor*, 49 A.3d 818, 824

(D.C. 2012) (holding that "officers must have reasonable, articulable suspicion to

conduct a vehicle search under the second prong of *Gant*."); *People v.

Chamberlain*, 229 P.3d 1054, 1057 (Colo. 2010) (explaining *Gant*'s use of phrases

like "reasonable to believe" and "reasonable basis to believe" indicate the Court

intended "some degree of articulable suspicion"); *People v. Evans*, 200

Cal.App.4th 735, (Cal. Ct. App. 2011) (rejecting the categorical approach and

concluding "a reasonable belief to search for evidence of the offense of arrest

exists when the nature of the offense, considered in conjunction with the particular

facts of the case, gives rise to a degree of suspicion commensurate with that

sufficient for limited intrusions such as investigatory stops.").

   The latter line of cases appear to provide the better reasoned approach,

particularly because some offenses – like a violation of a TRO – "defy easy

categorization."  *Evans*, 200 Cal.App.4th at 751.  In *Evans*, the court cited an

example of a driver arrested for making criminal threats.  The court noted that "[i]f

the threat in question was verbal, it is surely unreasonable to expect evidence

related to the crime to be contained in a vehicle.  But if the threat was made in a

text message, or amplified by means of props or a threatening drawing, evidence

might well be found in the car."  *Id.*  Similarly, in *Reagan*, the Court noted that it is

21

difficult "to decide whether a criminal offense such as telephone harassment 'by [its] nature . . . might yield physical evidence.'  Reasonable people could disagree about exactly what can be considered 'physical evidence,' and about whether there 'might' be any physical evidence of telephone harassment." *Reagan*, 713 F.Supp.2d at 732.

Because "some offenses of arrest cannot be meaningfully evaluated without reference to the specific facts known to the officer," *Evans*, 200 Cal.App.4th at 751, the Court declines to apply the categorical approach here.  The TRO could have been violated by Watson in a number of ways.  It could have been violated, for example, by failing to comply with any of the distancing requirements in the order, or by making a verbal threat.  In those circumstances, it would not be reasonable to expect to find evidence relevant to the crime of arrest in the vehicle. On the other hand, if a threat is made by text message, as here, it would be reasonable to believe that relevant evidence may be found in the defendant's cell phone if it is located within the vehicle.  In short, in these circumstances, the officer must know how the violation occurred in order to determine whether it is reasonable to believe that relevant evidence may be found in the vehicle.

As to the degree of suspicion required, the Ninth Circuit has indicated that the search incident to arrest exception under *Gant* "appears to require a level of suspicion less than probable cause."  *U.S. v. Rodgers*, 656 F.3d 1023, 1028, n.5

(9th Cir. 2011).  This certainly makes sense; otherwise, *Gant*'s search incident to arrest exception would merely duplicate the automobile exception.[2]  Other courts agree that "reasonable to believe" suggests a less demanding standard than probable cause.  *See United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010) ("Presumably, the 'reasonable to believe' standard requires less than probable cause[.]"); *United States v. Donahue*, 764 F.3d 293, 299, n.6 (3d Cir. 2014) (noting the *Gant* incident-to-arrest exception "requires a lesser basis for a search than a showing of probable cause");  *United States v. Polanco*, 634 F.3d 39, 42-43 (1st Cir. 2011) ("[T]he auto exception requires probable cause.  But the *Gant* evidentiary justification only requires a 'reasonable basis.'").  Thus, under this line of authority the 'reasonable belief' standard of *Gant* is akin to the "reasonable suspicion" standard required to justify a stop under *Terry*.  *See People v. Coates*, 266 P.3d 397, 399 (Colo. 2011).

Reasonable suspicion exists when there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.  "The reasonable suspicion standard is not a particularly high threshold to reach."  *United States v. Valdes-Vega*, 738 F.3d

---

[2] Under the automobile exception, "police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime."  *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010).

1074, 1078 (9th Cir. 2013). Reasonable suspicion must be more than a mere

hunch, but "the likelihood of criminal activity need not rise to the level required for

probable cause, and falls considerably short of satisfying a preponderance of the

evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

The standard for determining whether reasonable suspicion exists is an

objective one. *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir.

2016). Reasonable suspicion does not turn on the officer's subjective beliefs, but

"the facts justifying the stop must be known to officer[] at the time of the stop."

*Id.* Thus, the officer's subjective beliefs regarding whether the facts constitute

reasonable suspicion does not control. Rather, the Court makes the determination

based on an objective assessment of the facts within the officer's knowledge. *See*

*e.g. United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) ("Because

reasonable suspicion is an objective test, we examine the facts within the

knowledge of [the officer] to determine the presence or nonexistence of reasonable

suspicion; we do not examine the subjective beliefs of [the officer] to determine

whether he thought that the facts constituted reasonable suspicion."); *United States*

*v. Jones*, 990 F.2d 405, 408 (8th Cir. 1993) ("Because we decide whether

reasonable suspicion justifies a detention based on all the objective facts, we are

not limited by the detaining officer's subjective opinions.").

Here, the Government has not shown that the facts known to TFO Feuerstein provided reasonable suspicion that evidence relevant to the crime of arrest would be found in the vehicle.  While TFO Feuerstein testified that he learned Watson was being arrested for violation of the TRO at some point after he was taken into custody, he did not state he had knowledge of how Watson violated the order.  In fact, in his testimony TFO Feuerstein repeatedly focused on possession of a firearm as the basis for violating the protective order and as the purpose of his search.  See e.g. (Doc. 87 at 34:22-25) ("I was searching for offenses from the violation of the protective order, which were photographs showing that he had a gun and could harm himself or others.");  (*Id.* at 36:5) (asserting "the firearm" was a violation of the TRO); (*Id.* at 37:8-9) ("[p]ossession of a firearm is a violation of the protective order."); (*Id.* at 41:9-18) ("I admitted that I was searching for violations of an order of protection.  And clearly written in the order of protection is one may not possess firearms . . . possession of a firearm is a violation of the order of protection all on its own."); (*Id.* at 50:4-16) (stating purpose of search was to "identify whether or not the firearm which was the sole purpose of that and his attempted - - you know, saying he was going to commit suicide and harm [Jane Doe], to recover that firearm, as well as any other things that might come up for a violation of the TRO . . . [such as] notes or letters [or] anything he left").

As the Government candidly acknowledges, however, the TRO did not prohibit the possession of a firearm, and Watson did not violate the TRO by possessing a firearm. (*Id.* at 102:24-103:8; Doc. 55-3.) In addition, neither a firearm nor the pictures of Watson possessing a firearm, were the basis for his violation of the TRO. They initially provided the basis for the issuance of the TRO, but the TRO was violated by Watson's suicidal texts and possibly other verbal threats. The fact that TFO Feuerstein mentioned "notes or letters" as possible evidence of violation of the TRO further demonstrates that he did not have knowledge of how the TRO was violated.

Moreover, none of the other officers at the scene had knowledge of how Watson violated the TRO and whether evidence of the violation may be found in the vehicle. After Watson was secured, TFO Feuerstein and Detective Lapham and Officer Hillier returned to the original location of the stop. Detective Lapham then went home, and TFO Feuerstein stated he was going to search the vehicle. (Doc. 87 at 94:13-20). TFO Feuerstein testified that Officer Hillier assisted in the search, but Hillier denies that he did so. (*Id.* at 94:21-25.) Even if Officer Hillier assisted, he also had no knowledge of how Watson had violated the TRO. (*Id.* at 95:23-25.)

Nevertheless, even assuming that TFO Feuerstein knew Watson was arrested for violating the TRO because he contacted Jane Doe by text message, Feuerstein

26

would not have had reasonable suspicion to search the vehicle.  Granted, it would have been reasonable to believe that evidence of the text messages may be found in Watson's cell phone, and thus the cell phone would have contained evidence relevant to the crime of arrest.  But TFO Feuerstein knew Watson discarded his cell phone on the ground outside his vehicle.  (Doc. 87 at 25:20-25.)  Accordingly, there was no reasonable basis to believe the vehicle contained his cell phone or other evidence relevant to the crime of arrest.

Based on an objective assessment of the facts known to TFO Feuerstein, the Court finds it was not reasonable to believe evidence relevant to Watson's violation of the TRO might have been found in his car.  The search was therefore invalid, and all evidence seized from the vehicle should be suppressed.[3]

## C.    Search of the Cell Phone Pursuant to State Search Warrant

Finally, Watson argues the evidence obtained from the search of his cell phone should be suppressed as "fruit of the poisonous tree."  Watson asserts TFO Feuerstein obtained the search warrant for the cell phone based exclusively on his unconstitutional arrest and search of his vehicle.  The Government contends

---

[3] TFO Feuerstein appears to acknowledge that he originally planned to get a warrant to search the vehicle, stating "[h]ad he not run, I would have towed the car and sought a search warrant for it."  (Doc. 87 at 42:2-3.)  It is unclear, however, how Watson's flight provided grounds to search the vehicle incident to arrest, rather than obtaining a warrant.

Watson abandoned the cell phone, and therefore has no standing to challenge the search. Alternatively, the Government argues the phone was searched pursuant to a valid warrant, and even if the warrant is deemed improper, the good faith exception applies.

Evidence obtained as a direct or indirect result from an unlawful search or seizure is considered "fruit of the poisonous tree" and is inadmissible under the exclusionary rule. *Wong Sun v. United States*, 371 U.S. 471, 484-87 (1963). But if the defendant discards an item during flight, the evidence need not be suppressed because it was not obtained as a result of an unlawful seizure. *Hodari D.*, 499 U.S. at 629 (cocaine abandoned while the defendant ran from police was not the fruit of an illegal seizure because the defendant was never seized) *Hernandez*, 27 F.3d at 1407 (gun discarded during the defendant's flight from police was admissible because the defendant was not seized when he fled from the police); *McClendon*, 713 F.3d at 1217 (finding that because the defendant was not seized until he was tackled by officers, he lost his ability to challenge the admissibility of a handgun he tossed away as he was walking away from the officers); *United States v. Taylor*, 462 F.3d 1023, 1026 (8th Cir. 2006) (holding the defendant had abandoned his cell phone when he dropped it in the street while he was running from the police).

Because Watson was not seized until he was arrested on the grass, the cell phone he discarded during his flight was abandoned. "If a person has voluntarily

abandoned property, he has no standing to complain of its search or seizure."
*United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976).  Watson therefore
lacks standing to challenge the search of the cell phone.

Even assuming Watson has standing, the warrant is nevertheless valid.  A
search warrant must be supported by probable cause or "a fair probability that
contraband or evidence of a crime will be found in a particular place."  *Illinois v.
Gates*, 462 U.S. 213, 246 (1983).  Whether probable cause exists is based on an
assessment of the totality of the circumstances.  *Florida v. Harris*, 568 U.S. 237,
244 (2013).

Here, the warrant application included evidence from the unlawful search of
Watson's vehicle.  But "[t]he mere inclusion of tainted evidence in an affidavit
does not, by itself, taint the warrant or the evidence seized pursuant to the
warrant."  *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994) (quoting *United
States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987).  Instead, "a reviewing court
should excise the tainted evidence and determine whether the remaining untainted
evidence would provide a neutral magistrate with probable cause to issue a
warrant."  *Id.*

Excluding the evidence from Watson's vehicle, the search warrant
application still provides probable cause supporting the warrant's issuance.  The
application sought evidence related to "Violations of Order of Protection, Stalking

and Prohibited Person in Possession of a Firearm."  The application included the

following details: (1) the Billings Police Department was notified that Watson was

harassing a female employee at Western Security Bank;  (2) the female employee

advised the investigating officer that Watson had texted her pictures of himself

holding a firearm to his head; (3) the investigating officer notified TFO Feuerstein

of the pictures because he believed Watson was a federal convicted felon and was

prohibited from possessing firearms; (4) TFO Feuerstein confirmed that Watson

was a prohibited person for life as a result of a prior federal felony conviction; (5)

an Officer Caution was issued for Watson that included a description of Watson's

vehicle and the photographs of him with the firearm; (6) on July 29, 2019, TFO

Feuerstein and other officers from the Billings Police Department made contact

with Watson in a Walmart parking lot; (7) the officers attempted to arrest Watson,

but he fled on foot; and (8) after Watson was apprehended, TFO Feuerstein seized

items Watson had thrown to the ground, including the cell phone.

 The Court finds that, taken together, these facts support a finding of

probable cause that evidence of a crime – particularly the crime of felon in

possession – would be found in the cell phone.  Therefore, after excising the

tainted facts submitted in the application for the search warrant, the application

establishes probable cause to issue a warrant.  Thus, the evidence obtained from

the search of Watson's cell phone should not be suppressed.

Finally, even if the warrant was improperly issued, Watson presents no argument why the *Leon* good faith exception to the exclusionary rule would not apply.  *United States v. Leon,* 468 U.S. 897 (1984).

## III.   <u>CONCLUSION</u>

For the reasons stated above, **IT IS HEREBY RECOMMENDED** that Watson's Motion to Suppress (Doc. 53) be **GRANTED in part and DENIED in part**.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 13th day of April, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge

31